LOREN GIRSBERGER, Plaintiff-Appellee, v. JOHN KRESZ, Defendant-Appellant (Orlando Scherling, Defendant).

First District (1st Division)   Nos. 1—91—2372, 1—91—2475 cons.

Opinion filed December 27, 1993.—Rehearing denied May 18, 1994.

Jacobson, Brandvik & Anderson, of Chicago (Craig E. Anderson and Charles J. Corrigan, of counsel), for appellant.

Beigel & Sandler, of Chicago (Herbert Beigel and Philip Fertik, of counsel), for appellee.

JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiff Loren Girsberger filed suit against defendant John Kresz alleging tortious interference with contract and defamation. Plaintiff also sued defendant Orlando Scherling for defamation. Following a jury trial in the circuit court of Cook County, both defendants were found liable to plaintiff on the claims brought against each of them. Both defendants filed post-trial motions. The trial court granted Scherling's motion for judgment notwithstanding the verdict. The trial court ordered a remittitur on the counts against Kresz, but upheld the verdicts. Kresz timely filed a notice of appeal to this court. Scherling is not a party to this appeal.

The record on appeal indicates the following facts. A portion of plaintiff's testimony is presented in a statement of evidence in lieu of transcript. Plaintiff testified that from 1973 through the early 1980's, he was the president of Multiple Color Systems, Inc. (MCS), a photographic film processing company. MCS was one of a few companies that processed 5427 film. Plaintiff paid himself $60,000 in 1982 and 1983. According to plaintiff, MCS had annual sales of $1,400,000 at the time.

Plaintiff testified that in 1983, he was contacted by Kresz, whom plaintiff had met during a prior trip to Canada. Plaintiff and Kresz had been exchanging information. According to plaintiff, Kresz used 5427 film processing in Canada, subject to an oral noncompete agreement with plaintiff regarding the United States. Kresz proposed that he and plaintiff enter into a partnership in Chicago, where Kresz had established operations. Plaintiff testified that he initially declined the offer because he was interested in maintaining his lifestyle and business in Oregon.

However, on January 28, 1984, plaintiff entered into an employment and stock option agreement (agreement) with Bison Investments, Inc., and Clearwater Ltd. Kresz was a director and the largest shareholder of Bison Investments, Inc.; he was also the president of Clearwater Ltd. The agreement provided in part as follows:

"1. *EMPLOYMENT*. Bison hereby employs Girsberger and Girsberger hereby accepts employment, upon the terms and conditions hereinafter set forth.

2. *TERM*. Subject to the provisions for termination, as hereinaf-

ter provided, the term of this Agreement shall begin on February 1, 1984 and shall continue until terminated but in no event will it be terminated prior to January 31, 1990, unless Girsberger shall be guilty of willful misconduct or malfeasance.

3. *COMPENSATION.* For services rendered by Girsberger under this Agreement, Girsberger shall receive a management fee of FIFTY (50%) PERCENT of the Pre-Tax Net Income of Bison after Clearwater receives $100,000 of Pre-Tax Net Income and $100,000 is paid to [MCS]; thereafter Clearwater Ltd. and Girsberger shall be entitled to receive equal amounts of Pre-Tax net Income of Bison.
    ***

4. *ADVANCES ON MANAGEMENT FEE.* Girsberger shall be entitled to receive on account of his Management fee the sum of SIXTY THOUSAND ($60,000.00) DOLLARS per year, payable $1/12$ each month, commencing on the 1st day of March, 1984 and continuing on the 1st day of each month until such time as this agreement is terminated."

Paragraph four of the agreement was amended in handwriting and initialled by the parties as follows:

"If for a 6 (six) month period the corporation shall earn less profit so that Girsberger would overdraw his profit sharing in advances by drawing $5,000.00 (five thousand) per month; then advances on management fees to be re-negotiated and adjusted to current profit earning level."

The agreement further provided as follows:

"5. *DUTIES.* Girsberger shall be the manager of the Stone Park, Illinois, plant of Bison. *** Girsberger shall have the authority to run the business on a day-to-day basis respecting sales, employment, financial controls, inventory controls, with the right to hire and fire all personnel; however, subject to the Board of Directors of Bison."

Plaintiff had attached a purported second agreement between the same parties to his complaint, alleging that Bison had agreed to purchase the assets of MCS. Kresz denied this allegation. At trial, Kresz testified that in January 1984, Girsberger wrote that MCS was winding down in Oregon and invited Kresz to negotiate with MCS's creditors regarding equipment. Kresz testified that he paid creditors of MCS and paid approximately 30 cents on the dollar for MCS equipment needed to establish the Girsberger-run operation in Stone Park.

Plaintiff testified that he and his wife Stella then moved to Chicago. According to plaintiff, Kresz represented that all moving expenses would be reimbursed and that the salaries of MCS employees

coming to Chicago as well as three or four employees remaining in Oregon would be paid. A caravan of trucks moved equipment from Oregon to Chicago.

Girsberger assumed his duties under the agreement. According to plaintiff, there was a six- to eight-week start-up period. The statement in lieu of transcript indicates that two exhibits were introduced to show that April and May were profitable months of operation. Neither party has identified where the actual exhibits appear in the record on appeal. However, some of the exhibits introduced at trial were attached to a motion to supplement the record on appeal. The statement in lieu of transcript indicates that plaintiff was reviewing the company books, which were prepared at that time by someone named Dell.

Plaintiff testified that he met with accountant Les Brendt after a meeting of the Bison board of directors in May. The record indicates that Brendt was a certified general accountant—the Canadian equivalent of a CPA—who did accounting for Bison. Plaintiff testified that he discussed certain problems with Brendt. According to plaintiff, he and Brendt agreed that the company should use monthly profit and loss statements and that certain stores should be sold. Plaintiff also testified that Brendt told him that Kresz preferred the cash method of doing business and would refuse monthly profit and loss statements, even though they were needed and people did not know where the company's profit centers were located. Plaintiff testified that he approached Kresz the following day and requested monthly statements, but that Kresz did not respond.

Plaintiff stated that the sales of the company increased dramatically in June and July. Plaintiff remembered seeing statements in June that showed the company was making a profit. According to plaintiff, the company had over $210,000 in sales in August, as opposed to $56,000 in January. Plaintiff testified that the number of employees increased from four in January to 40 in August. The statement in lieu of transcript indicates that plaintiff arrived at various projections showing that the company would be making a profit, based on his knowledge of sales, expenses and inventory appreciation.

Plaintiff testified that by September, he was having difficulty receiving a monthly check. Plaintiff indicated that he spoke to Jorge Araujo, who the record indicates served as the bookkeeper for the Chicago operation, about payment and was told that he would have to speak to Kresz because Kresz was in charge. The record contains admissions that on October 1, 1984, Kresz withheld plaintiff's monthly advance and plaintiff's draws were cancelled.

On October 7, 1984, plaintiff received a report from Brendt purporting to show the performance of the Chicago operation from February through July. Plaintiff testified that Brendt's report showed a net loss of $102,848.53. Plaintiff testified that the report contained numerous errors. According to plaintiff, certain inventory and sales were not accounted for in the report. Plaintiff testified that if the deficiencies in the report were corrected, the business would have been profitable, even with a $5,000 monthly payment to plaintiff.

Plaintiff testified that he made notes detailing the deficiencies in the report. Plaintiff indicated that he wrote to Scherling about the matter. Plaintiff also indicated that he telephoned Brendt to discuss the report. Plaintiff testified that Brendt told him not to worry about the report and that they would discuss the matter when Brendt came to Chicago. According to plaintiff, Brendt never came to Chicago and no one discussed the report with plaintiff. Plaintiff further testified that there were no attempts by Kresz or anyone else to renegotiate plaintiff's monthly payment on the grounds of unprofitability.

On October 12, 1984, a meeting was held at Bison's Stone Park offices. The meeting was attended by plaintiff, Kresz and Scherling, who was a Bison shareholder at that time. According to plaintiff, approximately 10 people attended this meeting. Plaintiff testified that during this meeting, Kresz made a statement that included the phrase, "Now that the pilfering has stopped and the bookkeeping is in good hands." Plaintiff believed that this statement referred to him because he had acted as the bookkeeper between Dell's departure and Jorge's arrival—a period from approximately August through mid-September. Plaintiff testified that when he questioned Kresz's statement, Kresz directed Jorge to retrieve documents from Kresz's office. According to plaintiff, when Jorge returned with the documents, Kresz waved them back and forth, stating "This is what I mean." Plaintiff testified that he and Kresz were then "nose-to-nose" in heated argument and that Scherling exclaimed, "Wait a minute John, be careful what you say. You and Loren ought to speak about this in private."

Plaintiff testified that he discovered from Jorge that the documents Kresz waved at the meeting were a compilation of expense reimbursements and checks paid to plaintiff. According to plaintiff, these expenses were associated with moving MCS equipment and plaintiff's personal belongings to Chicago and were not improper.

Plaintiff indicated that after the October 12, 1984, meeting, three of the people who attended came into plaintiff's office and expressed disbelief at what had occurred. According to plaintiff, Scherling also came into plaintiff's office, telling plaintiff that Kresz would treat plaintiff "worse than a dog."

Plaintiff testified that Jorge would not issue a monthly check to him in October. Consequently, plaintiff fired Jorge on October 23, 1984, and paid himself for September.

According to plaintiff, Kresz came into his office and offered to sell plaintiff the Chicago operation for $1 million. Plaintiff testified that he indicated interest in the proposal, provided that certain MCS sales and equipment were included, but that Kresz refused these provisions and left the office. Plaintiff testified that he was terminated from Bison about 1 1/2 hours later. Plaintiff's exhibit 5 was introduced into evidence and was read by plaintiff. The exhibit purported to show the unanimous decision of the Bison board of directors to terminate plaintiff, finding him "guilty of willful misconduct and malfeasance." The document was signed by Kresz and Scherling. Plaintiff testified that the employment agreement provided that he was a director of Bison and that he had no input in the decision to terminate his employment.

Plaintiff testified that this document was presented to him by an attorney named Craig Anderson, whom the document authorized to enforce the termination of plaintiff's employment. According to plaintiff, Anderson returned approximately an hour later and told plaintiff, "Get your ass out of the building. You're trespassing, get your ass out of the building." According to plaintiff, Anderson threatened to call the police to arrest him and that a policeman in fact came to the scene. Plaintiff testified that the police did not arrest him after he presented evidence that he was the president of the company. Plaintiff further testified that he remained in his office for another three or four days and that employees brought him food and coffee. Plaintiff indicated that he left on the advice of counsel. Plaintiff testified that he attempted to return the following day to collect personal belongings, but was barred from entry by a police officer.

Plaintiff testified that he sought employment through two employment agencies, or "headhunters," telling them that he would accept employment anywhere in the country. According to plaintiff, the agencies asked why he was terminated and he indicated that he had been accused of stealing. Plaintiff was unable to gain employment through these agencies.

Plaintiff testified that he earned no money in November or December 1984. Plaintiff indicated that he earned approximately $25,000 as an independent contractor in 1985. Plaintiff also indicated that his earnings in the years 1986-89 were approximately $21,482, $28,400, $25,500 and $28,000, respectively. According to plaintiff, his home in Oregon was "repossessed," causing him to lose approximately

$86,000 in equity. Plaintiff testified that if he had finished his term with Bison under the agreement, he would have received $5,000 a month for 51 months and $1,000 in monthly automobile expense reimbursements for the same period.

Kresz testified that prior to the agreement with plaintiff, he had used the 5427 film process in Canada. Kresz indicated that the only reason he was using the 5427 process in Canada was because plaintiff had shared information about the process with him. Kresz also indicated that he shared franchise information with plaintiff. Kresz testified that in 1983, both his Chicago operation and plaintiff's business were losing money, but that he was convinced by plaintiff that pooling their resources would result in a profitable operation.

Kresz testified that he knew that Bison was losing money in April, May, June and July 1984, because he had to send money from his Canadian operations. The first document Kresz saw reflecting that Bison was not profitable was the report prepared by Brendt. Kresz testified that he approached plaintiff about the lack of profit and attempted to renegotiate plaintiff's monthly draw on at least a dozen occasions. According to Kresz, plaintiff became grouchier and grouchier and did not want to talk to Kresz.

Kresz testified that the October 12, 1984, meeting was attended not only by plaintiff, Scherling, Jorge and himself, but also by a number of managers of the company's studios and stores. Plaintiff gave rebuttal testimony that the meeting was attended by production staff and plant supervisors, not store managers.

Kresz testified that during the meeting, he expressed his concerns about the weekly reports prepared by each of the studios and stores. Kresz testified that the stores were very liberal in their spending and did not obtain receipts. Kresz admitted referring to "pilfering" during the meeting, but indicated that it was directed at everyone generally and not personally at plaintiff. Kresz testified that plaintiff asked whether Kresz was accusing him of stealing. Kresz stated that he told plaintiff that he was accusing plaintiff of bad management.

Kresz testified that he learned that plaintiff had been writing checks to himself on company accounts without proper authorization. According to Kresz, he had informed plaintiff that plaintiff could only write checks on a particular account that required three signatures. Kresz testified that he learned that plaintiff had deposited cash receipts into company accounts other than the account that required three signatures and then wrote checks to himself on these other accounts. Kresz indicated that in late October 1984, Jorge called him to inform him that plaintiff had fired Jorge because Jorge refused to let plaintiff write himself checks. Kresz stated that he did not authorize plaintiff to fire Jorge.

Kresz indicated that he and Scherling agreed to terminate the agreement with plaintiff for three reasons. First, Kresz stated that plaintiff diverted funds from the company for plaintiff's personal use. According to Kresz, plaintiff was overdrawn by approximately $60,000 over the $5,000 monthly draw, based on a statement prepared by Jorge. Second, Kresz indicated that plaintiff disobeyed his instruction to use only the three-signature account. Third, Kresz stated that plaintiff fired Jorge without board authorization.

On cross-examination, Kresz indicated that a number of the expenses reimbursed to plaintiff were moving, meal, gas or repair expenses. Kresz nevertheless maintained that at least one of the leasing expenses was for a personal vehicle.

Anderson testified that he did not call the police to arrest Girsberger. Rather, Anderson called the police because, in his experience, terminated employees were more reasonable when a third party with a semblance of office will talk to them.

Following the close of evidence and closing arguments, defendant Kresz was found liable to plaintiff in the amount of $392,000 for compensatory damages and $392,000 for punitive damages on the claim of tortious interference with contract. Defendant Kresz was also found liable to plaintiff in the amount of $175,000 for compensatory damages and $184,000 for punitive damages on the defamation claim. Defendant Scherling was found liable for defamation. Both defendants filed post-trial motions. The trial court granted Scherling's motion for judgment notwithstanding the verdict. The trial court ordered a remittitur on the counts against Kresz, reducing the damages to $289,028 for compensatory damages and $289,028 for punitive damages on the tortious interference claim and $150,000 for compensatory damages and $50,000 for punitive damages on the defamation claim. Kresz timely filed a notice of appeal to this court.

I

Initially, we address the appropriate standard or standards of review to be applied to this appeal. In his brief, Kresz often fails to specify whether he believes the trial court erred by denying his motion for judgment *n.o.v.* or whether he believes his motion for new trial should have been granted. The standards of review for each differ. A motion for judgment *n.o.v.* should be entered only in cases where all of the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 511, 229 N.E.2d 504, 513-14.) In contrast, the decision to grant or deny a motion for new trial rests within the discretion of

the trial court, but may be reversed when the verdict is against the manifest weight of the evidence. (See *Villa v. Crown Cork & Seal Co.* (1990), 202 Ill. App. 3d 1082, 1089, 560 N.E.2d 969, 973.) Where Kresz fails to specify the exact ruling he appeals, we address both standards of review.

On review of a trial judge's decision to deny a motion for judgment *n.o.v.*, all of the evidence must be reviewed in the light most favorable to the opponent of the motion. (*Thacker v. UNR Industries, Inc.* (1992), 151 Ill. 2d 343, 353-54, 603 N.E.2d 449, 454.) On review of a trial judge's decision to deny a motion for new trial, where the issue is whether the verdict was against the manifest weight of the evidence, the same rule applies. (See *Hamrock v. Henry* (1991), 222 Ill. App. 3d 487, 492, 584 N.E.2d 204, 208.) It is the function of the jury to weigh conflicting evidence; this court will not overturn a jury verdict merely because it could have made a different finding. *Hamrock*, 222 Ill. App. 3d at 492, 584 N.E.2d at 208-09.

## II

■ Kresz initially claims that the evidence presented at trial was insufficient to support plaintiff's claim of tortious interference with contract. The elements of this tort are: (1) the existence of a valid and enforceable contract between plaintiff and another; (2) defendant's awareness of this contract; (3) defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by defendant's wrongful conduct; and (5) damages. (*HPI Health Care Services, Inc. v. Mount Vernon Hospital, Inc.* (1989), 131 Ill. 2d 145, 154-55, 545 N.E.2d 672, 676.) Kresz argues that plaintiff failed to prove the first, third and fifth elements of the tort. We address each argument in turn.

## A

Kresz argues that the agreement between Bison and plaintiff was unenforceable at the time plaintiff was terminated because it did not set plaintiff's compensation beyond the first six months. Initially, it should be noted that Kresz here maintains that the $5,000 monthly payment was plaintiff's compensation, yet maintains later in his brief that plaintiff was entitled only to a share of profits and that the $5,000 monthly payment was not a salary. These positions seem inconsistent.

Nevertheless, in order for this court to find that an enforceable contract exists, the parties must have entered into an agreement which is sufficiently definite and certain such that its terms may be determined or implied. (*Penzell v. Taylor* (1991), 219 Ill. App. 3d 680,

688, 579 N.E.2d 956, 961.) Some terms of a contract may be missing or left to be agreed upon, but if an essential term is so uncertain that there is no basis for deciding whether the agreement has been kept or broken, no contract exists. (*Kahn v. First National Bank* (1991), 216 Ill. App. 3d 272, 276, 576 N.E.2d 321, 324.) For example, this court has held that an agreement not to collect on a note "as long as we progress toward profitability" or "had a chance at profitability" was too indefinite to be enforced. (*Champaign National Bank v. Landers Seed Co.* (1988), 165 Ill. App. 3d 1090, 1093-95, 519 N.E.2d 957, 960-61.) However, this court has also held that an agreement to manufacture a drug "at a negotiated price" could be enforced where the evidence showed that the parties intended to conclude the contract and had left the price term open because the parties agreed that it would be difficult to set the future price due to inflation. *Milex Products, Inc. v. Alra Laboratories, Inc.* (1992), 237 Ill. App. 3d 177, 187-88, 603 N.E.2d 1226, 1233-34.

In this case, the agreement between plaintiff and Bison provided that if for a six-month period, the corporation earned a small (or negative) profit such that plaintiff would overdraw his profit sharing in advances by drawing $5,000 per month, the advances on management fees were to be "re-negotiated and adjusted to current profit earning level." Kresz notes that the "current profit level" is not defined.

■ We conclude that this case is analogous to *Milex*, insofar as the parties entered the agreement knowing that a term might well have to be renegotiated in the future. This conclusion is underscored by the fact that the term at issue was a handwritten amendment separately initialled by the parties. Though this was not a breach of contract case, we note that the contract was sufficiently definite that it could be determined whether it was kept or broken. Either the business made sufficient profit to permit the advance on the management fee ($260,000 per annum) or it did not; if it did not, the parties either renegotiated or they did not. Thus, judgment *n.o.v.* was not warranted on this point of law.

B

Kresz contends that plaintiff failed to prove that Kresz was not legally justified in terminating plaintiff's employment. Kresz claims he had a qualified privilege as a director of Bison and president of Clearwater to interfere with the contract between Bison and plaintiff. A corporate officer may, for a proper business purpose and in good faith, influence the actions of the corporation. (*Mittelman v. Witous* (1989), 135 Ill. 2d 220, 249, 552 N.E.2d 973, 987.) This qualified privilege does not apply when the officer acts solely for his or her own

gain or solely to harm the plaintiff, as such conduct does not further the corporation's interest. (*Mittelman*, 135 Ill. 2d at 249, 552 N.E.2d at 987.) To be tortious, a corporate officer's action must be done without justification or maliciously. *Mittelman*, 135 Ill. 2d at 249, 552 N.E.2d at 987.

■ Kresz argues that he was justified in inducing termination of the agreement, relying on his testimony that plaintiff diverted company funds for plaintiff's personal use, disobeyed Kresz's instruction to use only the three-signature account and fired Jorge without board authorization. However, the record indicates that plaintiff testified that the Chicago operation was profitable, that plaintiff disputed the Brendt report to both Brendt and Scherling, and that Kresz nevertheless cancelled his monthly draw but did not attempt to negotiate a lower draw. Conflicting testimony was also presented regarding the propriety of certain expense reimbursements.

Moreover, plaintiff testified that the resolution terminating his employment was itself improper because it purported to be a unanimous decision of the Bison board of directors, despite the fact that plaintiff was a director of Bison under the agreement. Indeed, plaintiff testified that he did not receive proper notice of the meeting at which he was terminated as required under the corporation's bylaws. Given this record, a jury could infer that Kresz lacked justification for his actions. Kresz cannot meet the standard required for judgment *n.o.v.* or a new trial by relying only on his testimony and ignoring plaintiff's testimony.

Kresz, relying on *Costello v. Capital Cities Communications, Inc.* (1988), 125 Ill. 2d 402, 532 N.E.2d 790, claims that plaintiff was required to produce evidence of Kresz's subjective intent to prove actual malice. *Costello*, however, discusses subjective intent in the context of a libel claim. It is well established in the context of claims for tortious interference with contract that "malice" does not require a showing of ill-will, hostility or an intent to injure; rather, plaintiff must show only that defendant acted intentionally and without just cause. As noted above, plaintiff presented testimony to meet this standard.

### C

Kresz next contests the award of both compensatory and punitive damages on the claim of tortious interference with contract. We turn to address each claim in turn.

### 1

Kresz claims that plaintiff is not entitled to compensatory dam-

ages because plaintiff did not introduce competent evidence of lost profits. It is well established that lost profits are not a proper element of damages where proof of those profits is based on speculation. (*Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.* (1986), 143 Ill. App. 3d 168, 174, 491 N.E.2d 912, 917.) A plaintiff must present competent proof of lost profits from which a reasonable basis of computation may be derived. (*Nordhem v. Harry's Cafe, Inc.* (1988), 175 Ill. App. 3d 392, 396, 529 N.E.2d 988, 991.) A business must be established before a tortious interference so that the evidence of lost profits is not speculative. (See *Drs. Sellke & Conlon, Ltd.*, 143 Ill. App. 3d at 174, 491 N.E.2d at 917 (discussing interruption of business).) Evidence of past success in similar endeavors is not sufficient to support an award of lost profits, as conditions may vary with each endeavor. (*Drs. Sellke & Conlon, Ltd.*, 143 Ill. App. 3d at 174, 491 N.E.2d at 917.) Projections appropriately founded upon past demonstrated profits may establish lost profits with the requisite degree of probability. *Agrimerica, Inc. v. Mathes* (1990), 199 Ill. App. 3d 435, 452, 557 N.E.2d 357, 370.

In this case, plaintiff testified that he had paid himself $60,000 annually as president of MCS in the years immediately prior to entering into the agreement with Bison. Plaintiff also testified regarding various projections showing that the Chicago operation was profitable during the first six months of the agreement, based on his knowledge of sales, expenses and inventory appreciation. Plaintiff testified that he had served as bookkeeper for at least some portion of the relevant period of time. Plaintiff testified that if the deficiencies in the Brendt report were corrected, the business would have been profitable, even with a $5,000 monthly payment to plaintiff.

Kresz testified that after plaintiff was terminated, he sold the business to Nitu Film Processing (with which Kresz was also associated) for $1,050,000, but did not receive payment on the promissory note. Kresz also testified that a business in which he was an influential partner purchased the business in 1986 and that his cousin was running the business at the time of trial.

■ Thus, plaintiff presented testimony not only of his success and income in the 5427 film processing business before signing the agreement, but also of the profitability and projected profitability of the Chicago operation, based on both his knowledge of business finance and his access to the books when he served as bookkeeper. Plaintiff presented evidence that he was unable to obtain employment in the film processing business and had a smaller income in other endeavors following the termination of his employment with Bison. Moreover, as Kresz concedes in his brief, the award of compensatory

damages also encompassed plaintiff's loss of equity in his Oregon home.

In sum, plaintiff presented evidence of compensatory damages, including evidence that permitted the jury to award damages based on the projected profitability of the Chicago operation.

## 2

Kresz contends that the award of punitive damages was improper because plaintiff failed to establish any compensatory damages. However, as noted above, plaintiff did present such evidence.

■ Kresz also contests the punitive damage award on the ground that plaintiff failed to present evidence of Kresz's financial worth. Although a defendant's financial status is a factor to be considered in determining the propriety of a punitive damage award, plaintiff was not required to present such evidence. (*Deal v. Byford* (1989), 127 Ill. 2d 192, 204-05, 537 N.E.2d 267, 272.) The case upon which Kresz relies, *Black v. Iovino* (1991), 219 Ill. App. 3d 378, 580 N.E.2d 139, does not hold to the contrary. Rather, the *Black* court held that a punitive damage award was excessive where the plaintiff failed to introduce evidence of the defendant's financial worth. (But see *Verdonck v. Scopes* (1992), 226 Ill. App. 3d 484, 490-91, 590 N.E.2d 545, 549-50 (not applying *Black*); *Ekl v. Knecht* (1991), 223 Ill. App. 3d 234, 244, 585 N.E.2d 156, 164 (same).) In this case, both Girsberger and Kresz presented evidence that Kresz is an international entrepreneur who spent tens of thousands of dollars in the film processing business both during and after the events at issue in this case. Thus, the award of punitive damages was neither improper nor excessive in this case.

## III

Kresz argues that plaintiff failed to present evidence sufficient to support the jury's finding of liability on the claim of defamation. Kresz claims that both the oral statement regarding pilfering and the corporate resolution alleging willful misconduct and malfeasance were ruled defamation *per quod* by the trial court. The record indicates that the trial court ruled that the oral statement was defamation *per quod* and the resolution was defamation *per se.* Moreover, the record does not indicate that defendant sought special interrogatories regarding a verdict for each allegedly defamatory statement. Pursuant to section 2—1201 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1201), defendant must show that the evidence was insufficient to sustain any of the alleged grounds for recovery. (*Amp-Rite Electric Co. v. Wheaton Sanitary District* (1991),

220 Ill. App. 3d 130, 156, 580 N.E.2d 622, 639-40.) Thus, defendant must show that there was insufficient evidence to sustain a claim of either *per se* or *per quod* defamation. We turn first to Kresz's challenges to the claim defamation *per se*.

## A

■ Kresz initially contends that it was error for the trial court to grant judgment *n.o.v.* to Scherling on the defamation claim, but deny the motion as to himself. Kresz cites no authority in support of this proposition as a matter of law. Moreover, the argument assumes that the same claims were made and the same evidence adduced as to both defendants. However, a review of the record shows that this assumption would be false. In addition, it assumes that the trial court's decision granting judgment *n.o.v.* to Scherling was correct. That ruling, however, is not before this court. In sum, the question of whether the trial court properly denied Kresz's post-trial motion must rest on the sufficiency of the evidence against Kresz, not the evidence against Scherling.

## B

Kresz next contends that the statement in the corporate resolution that plaintiff was "guilty of willful misconduct and malfeasance" was not defamatory. Kresz notes that the agreement between Bison and plaintiff expressly stated that plaintiff could be terminated if found guilty of willful misconduct and malfeasance. Kresz also notes that plaintiff admitted that the language of the resolution "parrots" the language of the agreement. Thus, Kresz concludes that the statement may be innocently construed.

A statement is "defamatory" if it impeaches a person's integrity, virtue, human decency or reputation and thereby lowers that person in the estimation of the community or deters a third party from dealing with that person. (*Muck v. Van Bibber* (1992), 223 Ill. App. 3d 830, 834, 585 N.E.2d 1147, 1150.) *Per se* defamation exists where the statements so obviously injure the plaintiff's good name or reputation that the plaintiff need not prove injury or damages. (*Rosner v. Field Enterprises, Inc.* (1990), 205 Ill. App. 3d 769, 789-90, 564 N.E.2d 131, 143.) Statements that are actionable *per se* include, but are not limited to, those imputing an inability to perform or want of integrity in the discharge of duties of office or employment and those prejudicing a party in his or her profession or trade. (See *Costello*, 125 Ill. 2d at 414, 532 N.E.2d at 795.) Nevertheless, a statement that is reasonably capable of a nondefamatory interpretation, given its verbal or literary context, should be so interpreted. *Mittelman*, 135 Ill. 2d at 232, 552 N.E.2d at 979.

■ The trial court correctly noted that stating that plaintiff may be fired if he is guilty of willful misconduct and malfeasance is not the same as stating that plaintiff is guilty of willful misconduct and malfeasance. Indeed, the "innocent construction" rule upon which Kresz relies is based upon context. The phrase "guilty of willful misconduct and malfeasance" is expressed only as a contingency in the contract. However, in the corporate resolution terminating plaintiff's employment, it is a statement that clearly accuses the plaintiff of a want of integrity in the discharge of the duties of employment. Thus, Kresz has failed to show that the corporate resolution was not defamatory.

C

Kresz claims in passing that the statements in the corporate resolution were true. The corporate resolution stated that the Bison board of directors unanimously determined that plaintiff was guilty of willful misconduct and malfeasance. The record on appeal shows that the jury heard evidence that plaintiff was a director of Bison under the terms of the agreement and was not notified of the meeting at which the vote to terminate his employment occurred. The jury also heard Kresz's testimony as to the reasons he believed plaintiff guilty of willful misconduct and malfeasance and plaintiff's testimony as to the reasons why he believed he was not guilty of willful misconduct and malfeasance. Viewing the record in this case in the light most favorable to plaintiff, we cannot conclude that the evidence so overwhelmingly favors defendant that the jury's verdict cannot stand or that the verdict is against the manifest weight of the evidence.

D

Kresz contends that plaintiff failed to show that Kresz published the corporate resolution. Publication is an essential element of a defamation claim. (*Layne v. Builders Plumbing Supply Co.* (1991), 210 Ill. App. 3d 966, 975, 569 N.E.2d 1104, 1110.) Publication requires communication of the allegedly defamatory statement to someone other than plaintiff. *Layne*, 210 Ill. App. 3d at 975, 569 N.E.2d at 1110.

In this case, plaintiff testified that after he was notified of his termination, he observed Kresz and Anderson confer with a police officer outside his office. Plaintiff testified that the police officer entered his office with the corporate resolution. Anderson testified that he showed the corporate resolution to the police officer, but not in such a way that it could be read. Anderson also testified that the police officer did not receive a copy of the resolution.

■ Kresz has therefore demonstrated that the jury heard conflicting evidence on the issue of publication. Nevertheless, to obtain a reversal, Kresz must show that the jury was not entitled to infer from the evidence that Kresz and Anderson apprised the police officer of the substance of the corporate minute. Kresz has failed to do so in this case, given the record on appeal.

Kresz also maintains that assuming *arguendo* that the resolution was published to the police officer, it was absolutely privileged. Kresz relies upon *Layne*, which in turn discusses prior decisions addressing allegedly defamatory statements made to law enforcement authorities. (*Layne*, 210 Ill. App. 3d at 969-72, 569 N.E.2d at 1106-08.) However, these cases are concerned with statements made to law enforcement authorities preliminary to criminal investigations or regarding an alleged crime.

In this case, Anderson testified that the police were not called to the Chicago operation's offices to arrest plaintiff. Kresz points to no evidence that they sought to charge plaintiff with a crime or that anything they told the police officer was said in connection with a criminal investigation. Thus, the discussion of privilege in *Layne* is inapposite to this case.

E

Kresz claims that plaintiff failed to show that the statements in the corporate resolution were made with actual malice. Kresz thus challenges the jury's answer to a special interrogatory on the issue of actual malice. Yet Kresz merely makes this conclusory statement in his brief without argument or citation to authority. Thus, the issue is waived on appeal.

Moreover, even if the argument had been preserved on appeal, it would not have persuaded this court. In *Mittelman*, which also involved defamation in the private employment context, our supreme court suggested that a plaintiff may recover presumed and punitive damages for defamation *per se* without proving actual malice. (See *Mittelman*, 135 Ill. 2d at 234-35, 552 N.E.2d at 980.) The *Mittelman* court nevertheless concluded that the plaintiff was required to plead and prove actual malice to overcome a qualified privilege available to the defendant under Illinois law. (See *Mittelman*, 135 Ill. 2d at 235, 552 N.E.2d at 980-81.) It must be remembered, however, that *Mittelman* concerned motions to dismiss and that our supreme court was therefore concerned with whether the plaintiff's allegations were legally sufficient to state a claim. See *Mittelman*, 135 Ill. 2d at 226, 552 N.E.2d at 976.

We note that the law of qualified privilege was recently altered

by our supreme court in *Kuwik v. Starmark Star Marketing & Administration, Inc.* (1993), 156 Ill. 2d 16, 619 N.E.2d 129. The *Kuwik* decision indicates that whether a qualified privilege exists is a question of law to be determined by reference to more general policy concerns; conversely, it is the province of the trier of fact to determine whether the qualified privilege has been abused by examining the facts of a particular case, including whether the defendant acted in good faith. (See *Kuwik*, 156 Ill. 2d at 26-29, 619 N.E.2d at 134-35.) The *Kuwik* decision also broadens the definition of abuse of a qualified privilege to include not only a direct intention to injure another, but also any reckless act that shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties. (See *Kuwik*, 156 Ill. 2d at 30, 619 N.E.2d at 135-36.) Furthermore, in discussing the confusion surrounding this area of the prior case law, the *Kuwik* court equated a jury finding of actual malice to a finding of bad faith. *Kuwik*, 156 Ill. 2d at 26, 619 N.E.2d at 134.

In this case, while the jury instructions regarding the qualified privilege indicated that "[t]o lose the privilege, a corporate officer or director's acts must be done without justification or with actual malice," with the term "actual malice" defined as knowledge of falsity or reckless disregard for the truth, the instructions also indicated that good faith was a requirement of the qualified privilege.

■ The jury heard evidence detailing the actions of and the relationship between the parties prior to publication of the corporate minutes and could assess the validity of the charge of willful misconduct and malfeasance. The jury heard evidence that the agreement between Bison and plaintiff provided that plaintiff would become a member of the Bison board of directors. The jury heard evidence that the corporate resolution indicated that the Bison board of directors unanimously decided to terminate plaintiff's employment for willful misconduct and malfeasance, even though plaintiff received no notice of any meeting where the alleged unanimous decision was reached. The jury heard evidence from which it could infer that Kresz published the corporate resolution to a police officer for reasons unrelated to law enforcement.

Given this record, a reasonable jury could have concluded that Kresz did not act in good faith or that the corporate resolution was published with reckless disregard for the truth. Moreover, were an identical record amassed at a new trial, *Kuwik* would make it easier for a jury to consider whether defendant's publication was reckless, lacked good faith or lacked justification. Thus, even if defendant had

preserved this argument on appeal, it would not warrant the relief he seeks.

## F

Finally, Kresz maintains that the award of punitive damages was grossly excessive. Punitive damages are not awarded as compensation, but serve to punish the offender and to deter similar acts from occurring in the future. (*Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 414, 563 N.E.2d 397, 401.) The question of whether punitive damages are appropriate in a given case is a question of law for the trial judge, whereas the amount to be awarded is generally a jury question that will not be reversed unless the award is clearly excessive. See *Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 711, 450 N.E.2d 1199, 1206.

■ The trial court, after examining the record in this case, agreed with Kresz that the punitive damages awarded for defamation were excessive. The trial court ordered a remittitur to $150,000 in compensatory damages and $50,000 in punitive damages. That the compensatory damages awarded are now three times larger than the punitive damages indicates that the latter are no longer clearly excessive, given the facts and circumstances presented in this appeal. See *Hazelwood*, 114 Ill. App. 3d at 711, 450 N.E.2d at 1206.

## IV

Kresz claims that plaintiff and plaintiff's trial attorney engaged in misconduct that prejudiced his rights and entitles him to a new trial. Kresz presents a laundry list of objections—over 30 record citations and at least one claim that is *dehors* the record—in support of his contentions. However, Kresz has failed to cite a single case in support of these contentions, resulting in their waiver on appeal. *Susman v. Price* (1992), 230 Ill. App. 3d 639, 641, 594 N.E.2d 1332, 1333.

■ Even if the arguments had not been waived, they would not have persuaded this court. The claim for which Kresz provides the bulk of the citations to the record is that plaintiff's cross-examination of Kresz was filled with sarcastic comments and grandstanding. The record shows that the overwhelming majority of Kresz's objections were sustained and that the trial court admonished plaintiff's attorney, which would suffice to cure any prejudice that may have resulted from the manner of the cross-examination.

## V

Kresz next argues that the admission of irrelevant and prejudicial evidence at trial warrants a new trial. Again, Kresz presents a

laundry list of objections—61 to be exact. However, Kresz again fails to cite even one case in support of his contention that these objections warrant a new trial, resulting in their waiver on appeal.

In addition, a review of the record indicates that more than half of the objections cite the statement of evidence in lieu of transcript, which contains no record of any objection by Kresz. Moreover, in presenting a conclusory laundry list, Kresz provides no analysis of why any of the remaining objections should have been sustained.

■ Even if the objections had been preserved, they would not have persuaded this court. Kresz claims that plaintiff used much of the allegedly objectionable evidence to distract the jury from the actual issues on trial and that the evidence related to causes of action (such as fraudulent inducement to contract) that were dismissed before trial. However, much of the testimony to which Kresz objects was in fact relevant to the issues on trial. For example, the profitability of MCS prior to 1984 was relevant (though perhaps insufficient standing alone) to the issue of damages. Much of the evidence to which Kresz objects was relevant to the issue of good faith as an element of the defense of qualified privilege. Thus, even if the objections had been preserved, they would not have warranted a new trial in this case.

## VI

■ Kresz claims that the trial court improperly restricted his cross-examination of Girsberger. Again, Kresz cites no authority in support of his claim aside from M. Graham, Cleary & Graham's Handbook of Illinois Evidence (5th ed. 1990), stating the general proposition that character deserves a searching inquiry when it is at issue. Thus, the issue is waived.

## VII

Finally, Kresz contends that the trial court erred in refusing three instructions tendered by the defense. Kresz provides no argument or citation to authority regarding the first of these, which concerned a party's failure to produce evidence within his or her control. Thus, the claim is waived.

Kresz's second objection is that the trial court modified Kresz's proposed instruction on the issue of qualified privilege. Kresz fails to show where the instruction was tendered in the record or the wording of the proffered instruction, resulting in waiver. Indeed, a review of the record discloses the purported proposed instruction supposedly proffered by Kresz, but it is not marked as defendant's instruction number 27 as alleged by Kresz. Indeed, the record contains a

collection of instructions that are marked as defendant's instructions and bear a handwritten indication that they were refused or withdrawn; instruction number 27 is not included there.

■ Even if this objection had been preserved, it would not have persuaded this court. Kresz claims he proffered an instruction allegedly restating the rules of qualified privilege as stated in *Mittelman*:

"A corporate officer may, for a proper business purpose and in good faith, influence the actions of the corporation. Officers and directors have a qualified privilege to interfere with the contracts of the corporation. This qualified privilege does not apply when the officer acts solely for his own gain or solely for the purpose of harming the plaintiff, since such conduct is not undertaken to further the corporation's business. To lose the qualified privilege, a corporate officer or director's acts must be done without justification or with actual malice."

Kresz argues that he was prejudiced by the omission of the word "solely" from the instruction, as it would allow a jury to conclude that Kresz was not entitled to the privilege if he acted with a "mixed motive." However, the special interrogatory on the claim of tortious interference with contract indicates that the jury found that Kresz acted with actual malice. Thus, even if the objection had been preserved, the record shows that the jury would have found against Kresz even if the exact instruction he now seeks had been given.

The third instruction Kresz claims was improperly refused purportedly states the business judgment rule. Again, Kresz fails to identify where this instruction appears in the record.

In sum, Kresz's failure to preserve an adequate record of the instructions that he proffered and the reason for any refusal thereof results in waiver of the objections on appeal.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MANNING, P.J., and O'CONNOR, J., concur.