FIRST DIVISION
December 27, 2010

No. 1-09-1848


WALLACE C. LEYSHON,           ) Appeal from the
                              ) Circuit Court of
      Plaintiff-Appellee,     ) Cook County.
                              )
      v.                      ) No. 06 L 3745
                              )
DIEHL CONTROLS NORTH AMERICA,)
INC. and CHRISTOPH WEIGAND,   ) Honorable
                              ) Dennis J. Burke,
      Defendants-Appellants.) Judge Presiding.

      PRESIDING JUSTICE HALL delivered the opinion of the court:

      The plaintiff, Wallace C. Leyshon, brought suit against the

defendants, Diehl Controls North America, Inc. (DCNA) and

Christoph Weigand,[1] alleging their breach of an employment

contract, violation of the Illinois Wage Payment and Collection

Act (820 ILCS 115/1 et seq. (West 2006)), and defamation.

Following trial, the jury returned a verdict for the plaintiff

and awarded damages.  On the defamation claim, the jury awarded

the plaintiff $2 million in compensatory damages and $10 million

in punitive damages.  The trial court denied the defendants'

posttrial motion but granted their request for a remittitur,

reducing the punitive damages award to $6 million.

      On appeal, the defendants challenge only the finding of

liability on the defamation claim and the amount of the damages

awarded on that claim.  They contend that: (1) under the

_____

      [1]Christoph Weigand is referred to as both "Dr. Weigand" and

"Mr. Weigand" in the record.  We will refer to him as "Dr.

Weigand."

No. 1-09-1848

innocent-construction rule, there was no defamation per se, as a matter of law, (2) "invited defamation" was a complete defense to the defamation per se claim; (3) the compensatory damages award was excessive, and (4) the punitive damages award was excessive under Illinois common law and violated due process.

BACKGROUND

I. Facts

Diehl AKO Stiftung & Company, KG (Diehl), located in Germany, is the parent company of DCNA. The plaintiff had been president of DCNA since 2001. The plaintiff's employment was pursuant to a written contract. His most recent contract was effective January 1, 2005, through December 31, 2007. The contract was signed on behalf of Diehl by Dieter Neugebauer, chairman of the supervisory board of Diehl, and Dr. Weigand, a member of the supervisory board.

Relevant to the defamation allegations, the contract provided as follows:

> "The Company shall have the right to immediately terminate this Agreement and employee's employment for 'cause' without prior notice. 'Cause' shall include gross negligence, gross neglect of duties, gross insubordination and willful violation of any law applicable to the conduct of the Company's business and affairs."

On February 1, 2006, Dr. Weigand informed the plaintiff that he was terminated for cause.

2

No. 1-09-1848

## A. Liability Evidence

The parties do not dispute the facts surrounding the utterance of the words or the words themselves the plaintiff alleged defamed him. Those facts are summarized below.

On February 1, 2006, the plaintiff was in his office at DCNA. At 11 a.m., Heinz Ruediger Kraemer, chief financial officer of DCNA, entered the plaintiff's office accompanied by Dr. Weigand, the new chairman of DCNA. Almost immediately, Dr. Weigand announced to the plaintiff that he was fired. When the plaintiff asked the reason, Dr. Weigand replied that he was not required to give a reason. Citing the investment of his time and his career in DCNA, the plaintiff continued to press Dr. Weigand for a reason for his termination. Again, Dr. Weigand told the plaintiff he did not have to tell him the reason.

After summoning John Dugan, a part-time human resources employee, to serve as a witness, the plaintiff requested that Dr. Weigand repeat what he had stated to the plaintiff. Dr. Weigand repeated that the plaintiff was terminated. When the plaintiff then asked what he was terminated for, Dr. Weigand responded, "'for cause.'" When the plaintiff expressed incredulity, Dr. Weigand stated, "'You are terminated for cause under the terms of your employment agreement.'" The plaintiff responded, "'You are telling me that you are firing me for gross insubordination, for gross misconduct, for gross negligence and willful violation of the law?'" Dr. Weigand responded, "'Yes'" and would not elaborate

3

further. When the defendant asserted he had rights as an employee, Dr. Weigand informed him that Diehl was fully committed to this decision and would commit its "ample" resources to contest any steps the plaintiff might take. The plaintiff was ordered to vacate his office immediately.

## B. Damages Evidence

The plaintiff testified as follows. After his termination, he returned home and informed his wife that he had been terminated for cause. She became extremely upset. The plaintiff found it very humiliating to have to tell his teenage son that he had been fired for cause. Two weeks later, he attended an employees dinner at which "nobody could look [him] in the eye."

The plaintiff explained that he took his reputation very seriously because it was the basis of his career in the industry in which he worked. The plaintiff's reputation impacted how effective he was in business and whether he appealed to business people. Given his experience, the companies he had worked for and how he was able to attract people to work for him, his reputation was very valuable. He was shocked by his termination because there was no basis for it. He was very humiliated to be terminated for cause. The view in the United States is that termination for cause means it is felony based or involves sexual misconduct.

According to the plaintiff, the alleged defamatory statement impacted his standing in the business community and his ability

4

No. 1-09-1848

to find work. He contacted several of the companies he had done business with while at DCNA, as well as several competitors. Despite repeated attempts to make contact with people at these companies, he received no response from any of them. Even the people he had regularly communicated with prior to his termination did not return his calls.

Kathleen Leyshon, the plaintiff's wife, testified as follows. Over the years, Mrs. Leyshon had been involved with the plaintiff's various business ventures. From her attendance at industry meetings and conventions, she observed that the plaintiff was highly regarded among the leaders in his industry. The plaintiff was honored with the Illinois Entrepreneur of the Year award, as well as a supplier award from Maytag, which was viewed as beneficial to DCNA.

According to Mrs. Leyshon, when the plaintiff returned home after his termination, he did not look well and was quite pale. When he told her the reasons for the termination, she was shocked and found it unbelievable. After building up a very good reputation, the whole experience of being terminated and having to remove his belongings from his office was extremely traumatic, upsetting and humiliating for the plaintiff. At a party the plaintiff and she organized to say goodby to the employees, many of them expressed concern for the plaintiff and his family.

The plaintiff also presented evidence that his termination was the result of the defendants' premeditated scheme to rid

5

themselves of the plaintiff. The plan required that the plaintiff be fired for cause, even though the defendants knew there was no basis for doing so. Mr. Neugebauer testified that Dr. Weigand wanted the plaintiff terminated for cause in order to avoid having to pay him the sums he would be entitled to under his contract. In addition, the plaintiff had voiced concern to Dr. Weigand over certain of Diehl's tax practices.

Richard Sbarbaro, an executive search management consultant, testified regarding the effect termination for cause had on the plaintiff's ability to find employment. Based on Mr. Sbarbaro's experience, the plaintiff would not be considered for a comparable position because of the implications of the termination for cause. Termination for cause referred to gross misconduct, significant financial malfeasance, sexual harassment or drug use on the job. Mr. Sbarbaro would never recommend a candidate who had been terminated for cause to a prospective employer.

Based on his 30 years of experience and his sensitivity to such issues, Mr. Sbarbaro believed that the plaintiff's termination for cause was known in the market place. He explained that it was very difficult to maintain confidentiality in business. The fact that the plaintiff's significant contacts refused his telephone calls signaled that the plaintiff's termination for cause was known outside of DCNA. In addition, it had been 2 1/2 years, and the plaintiff had yet to secure gainful

6

No. 1-09-1848

employment.

According to the defendants' witnesses, following the plaintiff's termination from DCNA, DCNA customers were told that the plaintiff was no longer with DCNA but were not told that the plaintiff was discharged for cause. While searching for a replacement for the plaintiff, Dr. Weigand told a recruiter that the plaintiff had been terminated suddenly because, while sales were increasing, profits were not.

The jury returned a verdict finding in favor of the plaintiff and against the defendants on the claim of defamation per se.[2] The jury awarded the plaintiff $2 million in compensatory damages and $10 million in punitive damages. The trial court denied the defendants' posttrial motion but granted a remittitur of the punitive damages award and reduced the award to $6 million. The defendants appeal.

ANALYSIS

I. Innocent-Construction Rule

The defendants contend that the denial of their motion for a judgment n.o.v. was error because, under the innocent-

---

[2] The jury rejected the defendants' position that the plaintiff's termination was "for cause" as defined in the employment contract and awarded damages for breach of the employment contract. The jury also found for the plaintiff on the defendants' counterclaim alleging breach of fiduciary duty and unjust enrichment.

7

construction rule, Dr. Weigand's statement, "'You are terminated for cause under the terms of your employment agreement,'" was not actionable.[3]

## A. Standard of Review

The preliminary construction of an allegedly defamatory statement is a question of law. Therefore, our review is de novo. Tuite v. Corbitt, 224 Ill. 2d 490, 511, 866 N.E.2d 114 (2006).

## B. Discussion

"A statement is defamatory if it tends to harm a person's reputation to the extent that it lowers that person in the eyes of the community or deters others from associating with that person." Tuite, 224 Ill. 2d at 501. Illinois recognizes five categories of statements that are defamatory per se, two of which are implicated in this case: statements imputing an inability to perform or want of professional integrity in performing employment duties and statements imputing a lack of ability or that otherwise prejudice a person in his profession or business. Tuite, 224 Ill. 2d at 501-02. Even if a statement falls into one of the per se categories, the statement will not be actionable if

---

[3] In their motion for partial summary judgment, the defendants argued, inter alia, that, under the innocent-construction rule, Dr. Weigand's statement could not support an action for defamation per se as a matter of law. The trial court denied their motion.

it is reasonably capable of an innocent construction.  Tuite, 224 Ill. 2d at 502.

In Green v. Rogers, 234 Ill. 2d 478, 917 N.E.2d 450 (2009), our supreme court explained the innocent-construction rule as follows:

"Under the 'innocent-construction rule,' a court must consider the statement in context and give the words of the statement, and any implications arising from them, their natural and obvious meaning. [Citation.]  Indeed, this court has emphasized that the context of the statement is critical in determining its meaning, as a given statement may convey entirely different meanings when presented in different contexts. [Citation.]  If the statement may reasonably be innocently interpreted, it cannot be actionable per se. [Citation.] Stated differently, 'a statement "reasonably" capable of a nondefamatory interpretation, given its verbal or literary context, should be so interpreted.  There is no balancing of reasonable constructions ***.' [Citation.]  At the same time, when the defendant clearly intended and unmistakably conveyed a defamatory meaning, a court should not strain to see an inoffensive gloss on the statement. [Citation.]" (Emphasis in original.)  Green, 234 Ill. 2d at 499-500, quoting Mittelman v. Witous, 135 Ill. 2d 220, 232, 552 N.E.2d 973 (1989), abrogated on other grounds in Kuwik v. Starmark Star Marketing & Administration, Inc., 156 Ill.

9

No. 1-09-1848

 2d 16, 619 N.E.2d 129 (1993).

     In Skopp v. First Federal Savings of Wilmette, 189 Ill. App.
3d 440, 545 N.E.2d 356 (1989), the reviewing court held that "for
cause" was not actionable because the words were capable of an
innocent construction.  The plaintiffs' employment at First
Federal was terminated.  In speaking with members of a placement
firm hired by First Federal to assist the plaintiffs, First
Federal's vice-president stated that the plaintiffs had been
terminated for cause.  According to the plaintiffs, in the
savings and loan industry, the term "for cause" meant that the
plaintiffs had engaged in misconduct.  The trial court granted
summary judgment to the defendants, and the plaintiffs appealed.

     The reviewing court affirmed the summary judgment.  The
court determined that the plaintiffs failed to establish that the
placement firm members had any specialized knowledge of the
savings and loan industry so as to understand the industry
meaning of "for cause."  The court further found that, even if
the industry definition was applicable, besides serious instances
of misconduct, the definition of "for cause" contained in the
federal rules and procedures listed several reasons for
termination, which did not impart unfitness or want of integrity
and which would not prejudice someone in his profession.  Skopp,
189 Ill. App. 3d at 446.

     Noting that courts in Kansas and New York had found the
statement terminated "for cause" to be actionable, the court in

10

No. 1-09-1848

<u>Skopp</u> agreed with the court in <u>Terry v. Hubbell</u>, 22 Conn. Supp. 248, 167 A.2d 919 (1960), explaining as follows:

"[In <u>Terry</u>], it was held that the statement was not libel <u>per</u> <u>se</u> because '[t]aken in their "natural and ordinary meaning," the words "discharged for cause" mean no more than that the plaintiff was released or dismissed from an office or employment for some undisclosed circumstance which operated to produce that effect.'" <u>Skopp</u>, 189 Ill. App. 3d at 445, quoting <u>Terry</u>, 22 Conn. Supp. at 256, 167 A.2d at 923.

The plaintiff maintains that the result in <u>Skopp</u> must be viewed in light of subsequent Illinois decisions applying the innocent-construction rule. In <u>Bryson v. New America Publications, Inc.</u>, 174 Ill. 2d 77, 672 N.E.2d 1207 (1996), our supreme court emphasized that the innocent construction must be reasonable. The court explained that the innocent-construction rule did not apply simply because the allegedly defamatory words were "capable" of an innocent construction. The court explained further as follows:

"In applying the innocent construction rule, courts must give the allegedly defamatory words their natural and obvious meaning. [Citations.] Courts must therefore interpret the allegedly defamatory words as they appeared to have been used and according to the idea they were intended to convey to the reasonable reader. [Citation.] When a

11

defamatory meaning was clearly intended and conveyed, this court will not strain to interpret allegedly defamatory words in their mildest and most inoffensive sense in order to hold them nonlibellous under the innocent construction rule." Bryson, 174 Ill. 2d at 93.

In Bryson, the court found that it need not determine whether the term "slut" always implied unchastity. Given the context of the statement, the court refused to find that the defamatory word must be innocently construed as a matter of law. Bryson, 174 Ill. 2d at 94. More recently, the decision in Green, reemphasized the importance of the context in which the alleged defamatory words were uttered. In Green, the supreme court found that the statement accusing the plaintiff, who had served as a little league coach and manager, of misconduct and stating that he abused players, coaches and umpires, was capable of an innocent construction, given the very broad meanings of "misconduct" and "abuse," as well as the context in which they were used. Green, 234 Ill. 2d at 501-02. Since the abuse and misconduct statements were then followed by assurances that the plaintiff would be free to assist with activities involving his son's team, the court found the statements reasonably capable of an innocent construction. Green, 234 Ill. 2d at 503.

In contrast to Skopp, where as long as a word or statement could be innocently construed, it was nonactionable under the innocent-construction rule, under Bryson and its progeny, just

12

No. 1-09-1848

because a word may have an innocent meaning does not require that it be innocently constructed. The context in which the words or statement were uttered also must be considered. In the present case, the context in which Dr. Weigand's statement was made was the sudden termination of the plaintiff's employment and Dr. Weigand's confirmation that the reasons for the plaintiff's termination were gross insubordination, gross misconduct, gross negligence and willful violation of the law.

We conclude that, given the context in which Dr. Weigand's statement that the plaintiff was terminated for cause was made, the statement cannot reasonably be construed as having an innocent meaning as a matter of law.

II. The Invited-Defamation Defense

The defendants contend that, as the plaintiff "invited" Dr. Weigand's statement and even summoned a witness to hear it, the invited-defamation defense applies and completely defeats the plaintiff's claim. The defendants concede that they did not raise this defense until their posttrial motion. The defense is forfeited as explained below.

In Thornton v. Garcini, 237 Ill. 2d 100, 928 N.E.2d 804 (2009), our supreme court held that the defendant forfeited his right to raise the single-recovery rule to bar damages for emotional distress by raising the rule for the first time in a posttrial motion. Thornton, 237 Ill. 2d at 112. The defendant had numerous opportunities to raise the rule: as an affirmative

13

defense, in pretrial motions in limine, in a motion for a directed verdict, and during the jury instructions conference. Due to the defendant's failure to raise the issue before the entry of the jury's verdict, the plaintiff had no notice or opportunity to defend against the defendant's claim. Therefore, the issue was forfeited. Thornton, 237 Ill. 2d at 112.

The defendants maintain that section 2-1202(b) of the Code of Civil Procedure (735 ILCS 5/2-1202(b) (West 2008)) preserved their right to raise the defense. Section 2-1202(b) provides as follows:

"Relief after trial may include the entry of judgment if under the evidence in the case it would have been the duty of the court to direct a verdict without submitting the case to the jury, even though no motion for directed verdict was made or if made was denied or ruling thereon reserved." 735 ILCS 5/2-1202(b) (West 2008).

A motion for a judgment n.o.v. may be made in a posttrial motion, to challenge the plaintiff's failure to prove an element of his case. Kennan v. Checker Taxi Co., 250 Ill. App. 3d 155, 160, 620 N.E.2d 1208 (1993).

The defendants assert that the invited-defamation defense is not an affirmative defense, but acts to prevent the plaintiff from proving the publication, a necessary element of his cause of action for defamation. The defendants maintain that, as in Kennan, section 2-1202(b) preserved their right to raise the

14

plaintiff's failure to prove publication. We disagree.

The invited-defamation defense is an affirmative defense. An affirmative defense is defined as "[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true." Black's Law Dictionary 451 (8th ed. 2004). Section 11:15 of Illinois Jurisprudence, Personal Injury & Torts (11 Ill. Jur. Personal Injury & Torts §11:15 (2009)) provides that where the publication is procured by the plaintiff, it is not actionable. Accordingly, where the plaintiff has proven all the elements of defamation per se, including publication, the affirmative fact that the plaintiff invited the publication will defeat the cause of action. See the Restatement (Second) of Torts §§583, 584 (1977) (except in the case of honest inquiry or investigation, consent of the person defamed is a complete defense to an action for defamation).

The defendants rely on decisions from other jurisdictions, holding that invited defamation involves a lack of publication. In Williams v. School District of Springfield, 447 S.W.2d 256 (Mo. 1969), overruled on other grounds by Bass v. Nooney Co., 646 S.W.2d 765 (Mo. 1983), the court observed that there was no publication where the defamation was invited by the plaintiff. Williams, 447 S.W.2d at 268, relying on 33 Am. Jur. Libel & Slander §93, at 105-06. However, that statement is at odds with both the Restatement and Illinois Jurisprudence that the invited-

No. 1-09-1848

defamation defense is a total defense to an action for defamation. In Charles v. State Department of Children & Family Services, District 9, 914 So. 2d 1 (Fla. App. 2005), the court recognized the general rule that invited defamation was a complete defense to an action for defamation, but explained that "Florida has approved this general rule but has couched it in terms of a lack of 'publication,' one of the elements necessary to establish a prima facie case of slander." Charles, 914 So. 2d at 3. Therefore, the holding in Charles is peculiar to Florida law.

As an affirmative defense, the invited-defamation concedes that there has been publication, as well as the other elements of defamation, but because it was "invited," the defamation is not actionable. Unlike Kennan, the defendants' posttrial request for a judgment n.o.v. was not based on the plaintiff's failure to prove a necessary element of his cause of action but on an affirmative defense, which would have defeated the plaintiff's cause of action for defamation. Therefore, section 2-1202(b) did not preserve the defendants' right to raise the invited-defamation defense in their posttrial motion.

We further reject the defendants' contention that they had no opportunity to raise the invited-defamation defense prior to their posttrial motion because the amended complaint did not set forth the circumstances in which the alleged defamatory statement was made. Once the trial began, the defendants were fully aware

16

of the circumstances in which the statement was made.  Their failure to raise the defense in their motion for a directed verdict or, even after hearing all of the evidence, failing to request a jury instruction on the defense, belies the defendants' assertion that their first opportunity to raise the defense was in their posttrial motion.

As in Thornton, the defendants' failure to raise the defense of invited defamation prior to the jury verdict, denied the plaintiff the opportunity to respond to a defense that, if proven, would have been a complete defense to the plaintiff's cause of action.  Therefore, the defendants have forfeited the invited-defamation defense.

### III. Compensatory Damages

The defendants contend that the trial court erred when it denied their motion for a remittitur of the compensatory damages award.  They maintain that the evidence does not support the $2 million compensatory award.

### A. Standard of Review

This court reviews a ruling on a motion for a remittitur for an abuse of discretion.  Diaz v. Legat Architects, Inc., 397 Ill. App. 3d 13, 45, 920 N.E.2d 582 (2009).

### B. Discussion

Where, as here, a defamatory statement is actionable per se, the plaintiff is not required to plead and prove actual damage to his or her reputation to recover damages.  Bryson, 174 Ill. 2d at

17

87.  As the supreme court explained, "statements that fall within these actionable per se categories are thought to be so obviously and materially harmful to the plaintiff that injury to her reputation may be presumed."  Bryson, 174 Ill. 2d at 87.  In addition, "it is often extremely difficult, if not impossible, to present evidence to support an award of compensatory damages based on the actual harm sustained."  Gibson v. Philip Morris, Inc., 292 Ill. App. 3d 267, 278, 685 N.E.2d 638 (1997).  Presumed damages include damages for mental suffering, personal humiliation, impairment of professional reputation and standing in the community and for economic loss.  Gibson, 292 Ill. App. 3d at 278.

The defendants maintain that, in the absence of specific proof, the plaintiff was not entitled to damages for lost employment opportunities.  Dr. Weigand testified that no one outside of the Diehl organization was told that the plaintiff was terminated for cause.  He also testified that, by letter or in some cases in a meeting, DCNA's customers were told only that the plaintiff was no longer with DCNA.

However, Dr. Weigand did not explain what reason was given for the plaintiff's departure.  There was also evidence Dr. Weigand told an executive recruiter that the plaintiff's termination was sudden.  Mrs. Leyshon testified that the DCNA employees attending the farewell party expressed their concern for the plaintiff.  The plaintiff testified that people at the

18

party would not look him in the eye and that his contacts in the industry no longer returned his calls. Mr. Sbarbaro testified that the fact that the plaintiff was terminated for cause would be hard to keep confidential, as demonstrated by the plaintiff's lengthy period of unemployment. In Mr. Sbarbaro's opinion, the plaintiff would never be able to obtain another executive position.

The cases relied on by the defendants are distinguishable. In Zechman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 742 F. Supp. 1359 (N.D. Ill. 1990), the defamation count was dismissed based on the innocent-construction rule; the issue of damages was never reached. In Vilien v. Department of Education of City of New York, No. 06-CV-3491 (S.D.N.Y. March 31, 2009), there was no issue as to damages because the plaintiff failed to prove defamation. In Chenoweth v. Maui Chemicals & Paper Products, Inc., No. 07-00092 DAE-KSC (D. Haw. September 3, 2008), the court granted summary judgment to the defendants on the defamation claim where the plaintiff could not identify the defamatory statements and merely relied on rumors.

The defendants also rely on Soto-Lebron v. Federal Express Corp., 538 F.3d 45 (1st Cir. 2008). In that case, the employee was discharged after being suspected of sending cocaine in a Fed Ex package. The allegation proved false, and the employee sued claiming, inter alia, damages for defamation. The court found that the employee's economic and emotional problems resulted from

19

the fact of termination and were not connected to his libel claim. The court pointed out that there was no evidence that the employee's subsequent employers ever saw the libelous statements made by Fed Ex. Soto-Lebron, 538 F.3d at 66-67. Unlike Soto-Lebron, the testimony of the plaintiff, his wife and Mr. Sbarbaro provided evidence that knowledge of the defaming statement had spread beyond DCNA.

Finally, the defendants maintain that $2 million in compensatory damages is excessive in light of the decisions in Republic Tobacco Co. v. North Atlantic Trading Co., 381 F.3d 717, 734 (7th Cir. 2004), and Brown & Williamson Tobacco Corp. v. Jacobson, 827 F.2d 1119 (7th Cir. 1987). In Brown & Williamson, the trial court reduced a jury verdict of $3 million in compensatory damages to $1. After determining that the jury award was not based on passion or prejudice because it was lower than that requested by the plaintiff, the court of appeals found that $1 million was the appropriate award, explaining as follows:

> "Although the jury did conscientiously fulfill its duty in this case, we are hesitant to uphold the entire [$3 million] award. Illinois law requires appellate courts to examine jury awards under the doctrine of presumed damages with great care to determine whether they are 'substantial' or within an acceptable range. [Citations.] We hold that an award of $1,000,000 in compensatory damages is appropriate in this case. The $1,000,000 in presumed

20

damages is sizable but on the facts of this case it is not 'substantial' under Illinois law. We grant that it is difficult to draw a distinction ***." Brown & Williamson, 827 F.2d at 1142.

Observing that television was a powerful medium, the court noted that the defamatory material was broadcast four times by a respected journalist and in a television market of approximately 2.5 million people. The court concluded as follows:

"We recognize that this is a very inexact and somewhat arbitrary process. Nonetheless, the process is inherent in the doctrine of presumed damages. An appellate court must, under Illinois law, use its judgment in determining the extent to which a jury award of presumed damages will be upheld. Our judgment is $1,000,000." Brown & Williamson, 827 F.2d at 1142.

In Republic Tobacco Co., the court reduced a compensatory award of $3.36 million to $1 million. The court held that "in a case lacking proof of economic injury and where the defamatory statements were publicized to a limited audience, it would be inappropriate to award presumed damages that are exponentially greater than have been awarded in past cases. The court continued as follows:

"While we are mindful that under the doctrine of presumed damages a party is not required to show specific loss, there must be some meaningful limit on the magnitude of a jury

21

award when it is arrived at by pure speculation. Presumed damages serve a compensatory function - when such an award is given in a substantial amount to a party who has not demonstrated evidence of concrete loss, it becomes questionable whether the award is serving a different purpose." Republic Tobacco Co., 831 F.3d at 734.

Unlike the above cases, the plaintiff did not rely solely on the presumption of damages but also presented proof of damages. That evidence was largely uncontradicted. We conclude that the trial court's denial of a remittitur of the compensatory damages was not an abuse of discretion.

## IV. Punitive Damages

Notwithstanding the trial court's reduction of the punitive damages from $10 million to $6 million, the defendants contend that the punitive damages award is still excessive under Illinois common law and violates due process. As the Illinois punitive damages inquiry is distinct from the constitutional challenge (Blount v. Stroud, 395 Ill. App. 3d 8, 22, 915 N.E.2d 925 (2009)), they will be addressed separately.

### A. Illinois Common Law

### 1. Standard of Review

As stated above, this court reviews a ruling on a motion for a remittitur for an abuse of discretion. Diaz, 397 Ill. App. 3d at 45. The underlying question is whether the trial court was correct in ordering the remittitur. Slovinski v. Elliott, 237

No. 1-09-1848

Ill. 2d 51, 61, 927 N.E.2d 1221 (2010).

Juries are charged with the determination of the amount of punitive damages because the amount depends so closely upon the fact-finding by the jury. Blount, 395 Ill. App. 3d at 22. The amount of punitive damages will not be reversed unless it must have been the result of passion, partiality or corruption. Blount, 395 Ill. App. 3d at 22. As the jury's determination of the amount of punitive damages is predominately a factual issue, the court will not reverse the award unless it is against the manifest weight of the evidence. Blount, 395 Ill. App. 3d at 22.

## 2. Discussion

The relevant circumstances to consider in reviewing a jury award of punitive damages include, but are not limited to, the nature and enormity of the wrong, the financial status of the defendant and the defendant's potential liability. Blount, 395 Ill. App. 3d at 22. Each case is assessed in light of the specific facts and circumstances involved, and the underlying purpose of a punitive damage award must be satisfied. Blount, 395 Ill. App. 3d at 22. As the supreme court recently reiterated: "Punitive damages 'are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future.' " Slovinski, 237 Ill. 2d at 57-58, quoting Loitz v. Remington Arms Co., 138 Ill. 2d 404, 414, 563 N.E.2d 397 (1990).

23

The court cautioned that, as punitive damages are not favored in the law and are penal in nature, courts must make sure they are not awarded improperly or unwisely. Slovinski, 237 Ill. 2d at 58.

The defendants argue that the $6 million punitive damages award is excessive in light of the $50,000 punitive damages award in Girsberger v. Kresz, 261 Ill. App. 3d 398, 633 N.E.2d 781 (1993). While factually similar because it involved an employment situation, that case does not assist the defendants. In Girsberger, the trial court remitted the jury's compensatory award from $175,000 to $150,000, and the punitive damages award from $184,000 to $50,000. The defendant appealed only the punitive damages award. The reviewing court held that as the compensatory award was now three times as much as the punitive damages award, the punitive damages award could not now be considered excessive. Girsberger, 261 Ill. App. 3d at 416. To the extent that the court in Girsberger relied on the ratio between the amounts, in Blount, the court noted that under the Illinois common law analysis, there was no requirement that the amount of punitive damages imposed on a defendant bear any particular proportion to the size of the plaintiff's compensatory recovery. Blount, 395 Ill. App. 3d at 23, citing Deal v. Byford, 127 Ill. 2d 192, 204, 537 N.E.2d 267 (1989).

The defendants point out that in the summary judgment proceedings, the plaintiff maintained that the statements made in

Girsberger were nearly identical to the ones made in this case. However, as the defendants acknowledge, the plaintiff's argument was made in the context of addressing the innocent-construction rule. As noted above, in determining punitive damages, each case is decided on its own facts.

Next, the defendants assert that the jury's original punitive damages award of $10 million was 5 times more than the plaintiff requested. As a result, the defendants reason that the jury failed to differentiate between the breach of contract claim and the defamation claim, as well as passion and prejudice on the part of the jury. The defendants correctly note that punitive damages may not be awarded for a breach of contract, even if the breach was willful. They point to remarks by the plaintiff's attorney in closing argument that the defendants had been taking $2 million per year out of DCNA and sending it to Diehl, and his multiple references to the plaintiff being "stabbed in the back," which, the defendants maintain, had nothing to do with the defamation claim.

The jury's punitive damages award was not five times more than the plaintiff requested. The plaintiff's attorney argued to the jury as follows:

"The evidence also is that the defendants had been taking $2 million in license fees and management fees to Diehl AKO. $2 million from this U.S. company that [the plaintiff] started. We ask with respect to punitive damages

25

that you award at least one year of the amount of transaction fees or license fees and management fees that has been going out of this U.S. company."

As recognized by the trial court during argument on the defendants' posttrial motion, the plaintiff was asking for a minimum of $2 million; it was not "a locked in amount." The plaintiff was not seeking only $2 million in punitive damages. Contrary to the defendants' argument that "stabbing the plaintiff in the back" could only refer to the breach of contract claim, it is also reflective of the evidence that the plaintiff worked hard for DCNA and that the defendants responded by defaming him. Moreover, the jury was instructed to assess the amount of punitive damages necessary to punish the defendants and to deter them and others from such conduct in the future.

Next, the defendants argue that, under Mullin v. Spangenberg, 112 Ill. 140 (1884), where the plaintiff offers no evidence of the defendant's financial condition, the plaintiff is entitled only to an amount based on the presumption that the defendant has no pecuniary resources. Mullin, 112 Ill. at 145-46. This district followed Mullin in Black v. Iovino, 219 Ill. App. 3d 378, 580 N.E.2d 139 (1991). In Black, the court observed that if the plaintiff fails to introduce evidence of the defendant's financial condition, the defendant is prohibited from doing so. Black, 219 Ill. App. 3d at 394. Relying on Mullin, the court in Black stated as follows:

26

"In other words, a plaintiff cannot have it both ways. While he may choose to not introduce any evidence of defendant's financial status, his doing so will limit his recovery of punitive damages to an amount sufficient to punish or deter a man who is without pecuniary resources."

Black, 219 Ill. App. 3d at 395.

Because the record was devoid of any evidence of the defendant's financial condition, the court reduced the punitive damages from $20,000 to $1,000. Black, 219 Ill. App. 3d at 395.

In Verdonck v. Scopes, 226 Ill. App. 3d 484, 590 N.E.2d 545 (1992), the Second District Appellate Court declined to follow the court's holding in Mullin limiting the amount of punitive damages where the plaintiff elected not to present any evidence. The court in Verdonck noted that while the supreme court had not explicitly overruled Mullins, it did so implicitly in Deal. Verdonck, 226 Ill. App. 3d at 490. In Deal, the court stated that it would not set aside the jury's punitive damages award where the plaintiff did not offer any evidence of the defendant's financial condition, noting that the defendant's financial condition was only one consideration. Deal, 127 Ill. 2d at 204-05. The court in Verdonck further noted that Black did not distinguish Deal, and therefore, the court found the holding in Black to be inconsistent with that of the supreme court in Deal. Verdonck, 226 Ill. App. 3d at 491.

Without referring to either Mullin or Black, subsequent

27

No. 1-09-1848

cases from this district have ruled that the failure of the plaintiff to offer evidence of the defendant's financial status did not require that the jury's punitive damages award be overturned.  See Gomez v. The Finishing Co., 369 Ill. App. 3d 711, 722, 861 N.E.2d 189 (2006); Levy v. Markal Sales Corp., 268 Ill. App. 3d 355, 382, 643 N.E.2d 1206 (1994) (the defendants had the burden of introducing evidence of their financial position, citing Deal).  Relying on Deal, the Fifth District Appellate Court stated as follows:

"If a defendant facing a punitive damages claim realizes that the plaintiffs are not presenting what would clearly be relevant financial-status evidence, the defendant bears the burden of putting on that evidence.  After all, the defendant is ultimately responsible for paying those damages.  If [the defendant] knew that he would have financial difficulties in paying a punitive damages award, then he should have so informed the jury. [The defendant] cannot now complain that the [plaintiffs] failed to present that evidence."  Ford v. Herman, 316 Ill. App. 3d 726, 734-35, 737 N.E.2d 332 (2000), citing Deal, 127 Ill. 2d at 205.

Since Deal, the prevailing authority is that a defendant is not entitled to overturn an award of punitive damages on the sole basis that the plaintiff did not present evidence of the defendant's financial status.  But see Warren v. LeMay, 142 Ill. App. 3d 550, 491 N.E.2d 464 (1986) (a defendant may not introduce

28

evidence of his financial status as an independent defense to the award of punitive damages unless the plaintiff offers such evidence, citing Mullin). We agree with the court in Verdonck that Mullin was implicitly overruled by the supreme court in Deal and that the holding in Black is inconsistent with Deal. Therefore, we will not overturn the award of punitive damages in this case because the plaintiff did not offer evidence of the defendants' financial status.

Finally, the defendants maintain that, since the enormity of the harm to the plaintiff was not great and considering the defendants' financial condition, the punitive damages award is excessive. The defendants did not introduce any evidence of Dr. Weigand's financial status. As for DCNA, the defendants rely on a DCNA financial statement, showing that DCNA had a negative net worth of $2.3 million in 2005, and $3.6 million in 2006. The plaintiff responds that the financial statement also provides that DCNA had a written agreement with Diehl for financial support through 2008. We find Slovinski instructive.

In Slovinski, the plaintiff sued for defamation, and the jury awarded $0 for lost wages, $0 for damages to the plaintiff's reputation, $81,600 for emotional distress and $2 million in punitive damages. The supreme court affirmed the appellate court's reduction of the punitive damages award from $2 million to $81,600. The supreme court explained as follows:

"In short, there was no evidence presented to the jury

29

that defendant had an intentional, premeditated scheme to harm plaintiff. The most that may be said on this record - and defendant does not contest this point - is that defendant's defamatory statements were made with a reckless disregard for plaintiff's rights. This places defendant's conduct on the low end of the scale for punitive damages, far below those cases involving a defendant's deliberate attempt to harm another person.

Other facts of record also indicate that a small punitive damages award is appropriate in this case. For example, the evidence before the jury was that defendant did not repeat the defamatory statements, but made them only once, in the July 1996 meeting. The scope of the publication was also limited, to those individuals present in the meeting.

Further, the jury's [award] with respect to compensatory damages shows limited harm to plaintiff." Slovinski, 237 Ill. 2d at 64.

The factors absent in Slovinski are present in this case. There was evidence of a premeditated scheme to harm the plaintiff, not just by terminating his employment but by announcing that it was for cause. It was a reasonable inference from the evidence at trial that the plaintiff's termination for cause had become public knowledge and prevented the plaintiff from obtaining comparable employment. Unlike the jury in

30

<u>Slovinski</u>, the jury in the present case awarded the plaintiff $2 million in compensatory damages, reflecting the jury's conclusion that the plaintiff sustained serious injury due to the defendants' conduct.  See also <u>Gibson</u>, 292 Ill. App. 3d 267 (appellate court affirmed punitive damage award of $1 million where the compensatory damage award was $215,000).

We conclude that the $6 million punitive damages award was not against the manifest weight of the evidence.

### B. <u>Due Process</u>

### 1. Standard of Review

Whether the amount of an award of punitive damages violates due process is reviewed <u>de novo</u>.  <u>International Union of Operating Engineers, Local 150 v. Lowe Excavating Co.</u>, 225 Ill. 2d 456, 870 N.E.2d 303 (2006).

### 2. Discussion

Under the relevant test to determine whether an award of punitive damages is excessive three factors are considered: " '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.' "  <u>Lowe Excavating Co.</u>, 225 Ill. 2d at 470, quoting <u>State Farm Mutual Automobile Insurance Co. v. Campbell</u>, 538 U.S. 408, 418, 155 L. Ed. 2d 585, 601, 123 S. Ct. 1513, 1520

(2003) (<u>Campbell I</u>).[4] The parties agree that the civil penalties imposed in comparable cases is not applicable to this case.

a. <u>Degree of Reprehensibility</u>

This factor is considered to be the most important in determining the reasonableness of a punitive damages award. <u>BMW of North America, Inc. v. Gore</u>, 517 U.S. 559, 575, 134 L. Ed. 2d 809, 826, 116 S. Ct. 1589, 1599 (1996). In determining reprehensibility, the court considers: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard for the health and safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery or deceit, or mere accident. <u>Lowe Excavating Co.</u>, 225 Ill. 2d at 470, citing <u>Campbell I</u>, 538 U.S. at 419, 155 L. Ed. 2d at 602, 123 S. Ct. at 1521.

The presence of one of these factors may not be sufficient to support a punitive damages award; the absence of all of the above factors renders any award suspect. <u>Campbell I</u>, 538 U.S. at 419, 155 L. Ed. 2d at 602, 123 S. Ct. at 1521. Since it is presumed that the plaintiff was fully compensated by the

_____

[4]The United States Supreme Court opinion will be referred to as <u>Campbell I</u>. The Utah Supreme Court's opinion on remand from the Supreme Court will be referred to as <u>Campbell II</u>.

compensatory damages, the defendant's conduct must be sufficiently reprehensible to warrant the imposition of further sanctions to achieve punishment or deterrence. Campbell I, 538 U.S. at 419, 155 L. Ed. 2d at 602, 123 S. Ct. at 1521.

Initially, there is no evidence that the defendants' conduct evidenced a reckless disregard for the safety of others. Therefore, this factor does not favor the plaintiff.

The defendants maintain that Dr. Weigand's statements did not cause any physical harm to the plaintiff. The plaintiff disagrees, relying on the evidence of his emotional distress and feelings of humiliation. The plaintiff relies on Seltzer v. Morton, 2007 MT 62, 336 Mont. 225, 154 P.3d 561. However, in that case, the defendant's conduct caused the plaintiff to suffer significant physical complications as a result of the emotional distress caused by the defendant's conduct. Seltzer, 2007 MT 62, ¶172, 336 Mont. 225, 154 P.3d 561. In the present case, the plaintiff provided no evidence of physical complications resulting from his emotional suffering.

The plaintiff also relies on Campbell v. State Farm Mutual Automobile Insurance Co., 2004 UT 34, ¶30, 98 P.3d 409 (Campbell II). Upon remand from the United States Supreme Court, the Utah Supreme Court held that because the harm had its origins in a financial transaction, rather than a physical assault or trauma, this did not govern whether the harm was economic or physical. The court determined that after assuring the plaintiffs-insureds

that their assets were not at risk, the defendant-insurer placed the plaintiffs at risk of having a judgment entered against them in a wrongful-death suit. When the judgment was in fact entered against the plaintiffs, the defendant abandoned them. The court found that the defendant caused the plaintiffs "profound noneconomic injury" and held that "[i]t simply will not do to classify this injury as solely 'economic' for the purposes of evaluating it under the first prong of the Gore reprehensibility test." Campbell II, 2004 UT 34, ¶¶29, 30, 98 P.3d 409.

The defendants rely on Slovinski where the supreme court upheld a remittitur of the $2 million punitive damages award to $84,600, an amount equal to the compensatory damages. The court determined that the facts warranted a small punitive damages award. In particular, the court noted that while damages were awarded for emotional distress, there was no evidence of physical harm to the plaintiff, i.e., no visits to doctors or therapists, no evidence the plaintiff missed work or altered his daily activities.

The analysis in Slovinski was made under the Illinois common law, not the constitutional standard. See Slovinski, 237 Ill. 2d at 65 (having affirmed the remittitur, the court was not required to determine if the award violated due process). Moreover, in Campbell II, the Utah court observed that by the Supreme Court's comment that the harm arose in the economic realm and not from a physical assault or trauma, the court did not "read this comment

34

to foreclose our value-based assessment of the type of injuries which may flow from the abuse of transactions in the economic realm, nor to bar us from judging the reprehensibility of such abusive conduct." Campbell II, 2004 UT 34, ¶23, 98 P.3d 409; but see Walker v. Farmers Insurance Exchange, 153 Cal. App. 4th 965, 63 Cal. Rptr. 3d 507 (2007) (economic and emotional injuries are not physical harm).

In Blount, this court addressed the reprehensibility factor and found that, while the harm to plaintiff was primarily emotional and economic, she suffered physical manifestations, such as anxiety attacks and an infection. In addition, she had been threatened with physical violence. The threats of physical violence made the defendant's conduct (in an employment-retaliation case) more reprehensible than one involving strictly emotional and economic harm. Blount, 395 Ill. App. 3d at 25.

In the present case, the plaintiff presented evidence of the emotional distress and humiliation he suffered as the result of the defamation. While emotional distress has been considered in determining reprehensibility, this factor does not strongly favor the plaintiff.

The third factor, financial vulnerability favors the plaintiff. In Blount, the defendant threatened the plaintiff, a single mother with two children, with the loss of her job if she testified in favor of another employee who was suing the defendant. Noting that single mothers had been recognized as

35

financially vulnerable, the court found this factor in the plaintiff's favor.  Blount, 395 Ill. App. 3d at 25.

In the present case, the plaintiff was in his mid-fifties and had devoted many years to building DCNA.  He supported his wife and two children.  His financial future was directly tied to DCNA.  Being fired for cause meant that the plaintiff lost his salary and all his benefits, including health insurance, immediately.  Moreover, Dr. Weigand told the plaintiff that Diehl's substantial resources would be utilized to see that the plaintiff never received any money.  While the plaintiff had made valuable contacts over the years, these contacts now proved worthless because he had been fired "for cause."

The fourth factor is whether the defendants had engaged in repeated misconduct.  By punishing a repeat offender more severely than a first-time offender, our courts have recognized that repeated misconduct is more reprehensible than an individual instance of wrongdoing.  See Gore, 517 U.S. 576-77, 134 L. Ed. 2d at 827, 116 S. Ct. at 1599-1600 ("strong medicine is required to cure the defendant's disrespect for the law").

 The plaintiff's reliance on O'Neill v. Gallant Insurance Co., 329 Ill. App. 3d 1166, 769 N.E.2d 100 (2002), is misplaced. The reviewing court found repeated misconduct by an insurer towards its insured within the confines of one claim.  However, in reaching that determination, the court also found that the insurer had engaged in a pattern of conduct over a five-year

36

period of refusing to settle cases, resulting in excess judgments against the insurer's Illinois customers, other than the plaintiff. O'Neill, 329 Ill. App. 3d at 1183-84.

There is no evidence that the defendants had ever terminated an employee under similar circumstances. The defendants' conduct toward the plaintiff was merely a pattern of misconduct within one extended transaction, but without evidence of instances of similar conduct by the defendants in relation to parties other than the plaintiff. See Willow Inn, Inc. v. Public Service Mutual Insurance Co., 399 F.3d 224, 232 (3d Cir. 2005). Therefore, the repeated misconduct factor does not favor the plaintiff.

The final factor is whether the harm to the plaintiff was the result of intentional malice, trickery or deceit, or mere accident. The defendants maintain that the "backstabbing" referred to by the plaintiff was related to his wrongful termination, not his defamation claim. The defendants further maintain that any finding of malice should be offset by the fact that the plaintiff invited Dr. Weigand's statement.

The jury heard evidence that the plaintiff's termination for cause was the end result of a plan by the defendants to rid themselves of the plaintiff to avoid paying him the sums he was entitled to under his employment contract. Even though they were aware that there were no grounds for terminating the plaintiff for cause, the defendants chose maliciously to proceed with the

37

plan. As further evidence of malice, Dr. Weigand threatened the plaintiff that Diehl would use its resources to insure that the plaintiff's efforts to contest his termination would fail. By choosing to defame the plaintiff in order to terminate his employment, the defendants acted with malice; the defamation did not occur by accident. Therefore, this factor favors the plaintiff.

We conclude that the defendants' conduct was sufficiently reprehensible. The defendants wished to terminate the plaintiff's employment without having to pay him the benefits due under his employment contract. In order to achieve this result, the plaintiff was terminated for cause, representing that he had committed acts of gross misconduct, when in fact, there were no grounds for firing the plaintiff. The defendants damaged the plaintiff's reputation, in effect ended his career, and caused him great humiliation.

Finally, the defendants threatened to use their considerable assets to see that the plaintiff never received any compensation. The use of the power of a corporation to humiliate and destroy the reputation of an individual who had faithfully served the corporation, warranted a significant amount of punitive damages.

b. Ratio Between Punitive and Compensatory Damages

Under the second Gore factor, the court compares the ratio between the actual harm to the plaintiff and the punitive damages award. Blount, 395 Ill. App. 3d at 26. This court has

recognized that " 'an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety,' and that 'few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.' " Blount, 395 Ill. App. 3d at 26, quoting Campbell I, 538 U.S. at 425, 155 L. Ed. 2d at 606, 123 S. Ct. at 1524.  However, as the court in Lowe Excavating Co. noted:

> "The Supreme Court has 'consistently rejected the notion that the constitutional line is marked by a simple mathematical formula' [citation] and has declined 'to impose a bright-line ratio which a punitive damages award cannot exceed.' " Lowe Excavating Co., 225 Ill. 2d at 484, quoting Gore, 517 U.S. at 582, 134 L. Ed. 2d at 830, 116 S. Ct. at 1602 and Campbell I, 538 U.S. at 425, 155 L. Ed. 2d at 605, 123 S. Ct. at 1524.

The defendants point out that in Lowe Excavating Co., the court noted that the best way to determine whether the ratio between the compensatory damages award and the punitive damages award was appropriate, was to compare it to awards in other similar cases.  Lowe Excavating Co., 225 Ill. 2d at 487.  The defendants rely on Mendez-Matos v. Municipality of Guaynabo, 557 F.3d 36 (1st Cir. 2009).  In that case, the plaintiffs sued for unlawful detention, which occurred in the midst of a contract dispute between the mayor and the construction company building a

39

municipal parking garage.  The jury awarded $35,000 in compensatory damages and $350,000 in punitive damages.  The court of appeals reduced the punitive damages award to $35,000.  The court determined, first, that the case involved conduct of a lesser degree of reprehensibility.  The court then cited the Supreme Court's statement in Campbell I, that where the compensatory award was substantial, " 'then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.' "  Mendez-Matos, 557 F.3d at 55, quoting Campbell I, 538 U.S. at 425, 155 L. Ed. 2d at 606, 123 S. Ct. at 1524.

In Campbell II, the court addressed the language in the Supreme Court's opinion in Campbell I, cited by the court in Mendez-Matos, as follows:

"In its discussion of the relationship between compensatory and punitive damages, the Supreme Court reaffirmed that ratios exceeding single-digits, which it strongly implied mark the outer limits of due process, may be appropriate only where ' "a particularly egregious act has resulted in only a small amount of economic damages," ' or where ' "the monetary value of noneconomic harm may have been difficult to determine." ' [Citation.]  ***  The 1-to-1 ratio between compensatory and punitive damages is most applicable where a sizable compensatory damages award for economic injury is coupled with conduct of unremarkable

40

reprehensibility." Campbell II, 98 P.3d at 418, quoting State Farm, 538 U.S. at 425, 155 L. Ed. 2d at 606, 123 S. Ct. at 1524, quoting Gore, 517 U.S. at 582, 134 L. Ed. 2d at 831, 116 S. Ct. at 1602.

The court in Campbell II, approved a ratio of 9-to-1 between the punitive damages award and the compensatory award ($9,018,780.75 and $1 million). See Campbell II, 2004 UT 34, ¶__, 98 P.3d 409.

The defendants' reliance on Lowe Excavating Co. is misplaced. There the supreme court reduced the punitive damages awarded in an illegal picketing case from $325,000 to $50,000; the compensatory award was $4,680. The court noted that the Union's conduct was much less egregious than in other cases where double-digit ratios between the punitive and compensatory damages awards had been upheld. Nonetheless, the court approved an 11-to-1 ratio in that case as reasonable and constitutional. Lowe Excavating Co., 225 Ill. 2d at 490.

In the present case, the punitive damages award was $6 million, after the remittitur granted by the trial court, and the compensatory damages award was $2 million. The ratio was 3-to-1. While the compensatory damage award was substantial, the defendants' conduct was significantly reprehensible. Therefore, the $6 million punitive damages award does not violate due process.

We conclude that the punitive damages award did not violate due process.

41

CONCLUSION

For all of the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

LAMPKIN and ROCHFORD, JJ., concur.

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
(Front Sheet to be attached to Each Case)

| | |
|---|---|
| **Please use following form:**<br><br><br><br>**Complete TITLE of Case** | WALLACE C. LEYSHON,<br><br>     Plaintiff-Appellee,<br><br>    v.<br>DIEHL CONTROLS NORTH AMERICA, INC. and CHRISTOPH WEIGAND,<br><br>    Defendants-Appellants. |
| **Docket No.**<br><br>**COURT**<br><br>**Opinion Filed** | **No. 1-09-1848**<br>**Appellate Court of Illinois**<br>**First District, First Division**<br>**December 27, 2010**<br>**(Give month, day and year)** |
| **JUSTICES** | **PRESIDING JUSTICE HALL delivered the opinion of the court.**<br>LAMPKIN and ROCHFORD, JJ.,     concur.<br>    dissents. |
| **APPEAL from the Circuit Court of Cook County: the Hon. _____ Judge Presiding**<br>_____<br>**For APPELLANTS, John Doe, of Chicago.**<br><br>**For APPELLEES, Smith and Smith, of Chicago (Joseph Brown, of counsel).**<br><br>**Also add attorneys for third party appellants and/or appellees.** | **Lower Court and Trial Judge(s) in form indicated in margin:**<br><br>**Appeal from the Circuit Court of Cook County.**<br><br>**The Hon. Dennis J. Burke, Judge Presiding.**<br>_____<br><br>**Indicate if attorney represents APPELLANTS OR APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.**<br><br>**FOR APPELLANTS:** E. King Poor, Charles Harper, J., Jacquelyn T. Pinnell, Joshua M. Schneider, Quarles & Brady LLP, 300 North LaSalle Street, Suite 4000, Chicago, IL 60654<br><br>**FOR APPELLEES:** Constantine L. Trela, Jr., Jeremy G. Mallory, Sidley Austin LLP, One South Dearborn Street, Chicago, IL 60603<br><br>Caesar A. Tabet, Mark H. Horwich, Tabet DiVito & Rothstein LLC 209 South LaSalle Street, 7th Floor, Chicago, IL 60603<br><br>**(USE REVERSE SIDE IF NEEDED)** |
| | |